IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **RICHARD P. MORROW,** **Plaintiff,** v. **OAK LAWN PARK DISTRICT,** **Defendant**. | Case No. 17-cv-07496 Judge Mary M. Rowland |

## MEMORANDUM OPINION & ORDER

Plaintiff Richard P. Morrow brings suit against Defendant Oak Lawn Park District on claims of sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the Court is Defendant's motion for summary judgment [53] and Plaintiff's motion to dismiss his sex discrimination claim without prejudice [58 at 2]. For the following reasons, Defendant's motion for summary judgment is granted. Plaintiff's motion to dismiss Count I without prejudice is denied.

## BACKGROUND

Plaintiff Richard "Rick" Morrow worked at the Oak Lawn Park District's (the "Park District") Stony Creek Golf Course pro shop and golf range as a seasonal, part-time employee in 2013 and 2014.[1] (Dkt. 57 at ¶¶ 3; 13). Seasonal employees are employed for a period of 3 to 10 months and the Park District is not obligated to rehire

---

[1] The undisputed facts are found in Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Dkt. 57), Defendant's Response to Plaintiff's Statement of Additional Facts (Dkt. 67), and accompanying exhibits (Dkt. 56).

1

them in the subsequent year. (*Id*. at ¶ 4). In 2013, Morrow worked regularly between the months of May and November on an irregular basis in the winter. (*Id*. at ¶¶ 3; 12-13). In 2014, Morrow worked between the months of April and November. (*Id*. at ¶¶ 13; 41).

Morrow worked under the direct supervision of William "Bill" Krueger, the Superintendent of Golf. (*Id*. at ¶ 6). Krueger reported to Madeline Kelly, the Executive Director of the Park District. (*Id*. at ¶ 7). Krueger initially handled all golf operations, including food and banquet operations, but in September 2014 his title changed to Golf Operations Manager, and Kelly hired Debbie Skelly to take over management of the golf course's restaurant. (*Id*. at ¶¶ 8-9). Skelly also directly reported to Kelly. (*Id*. at ¶ 10). Krueger remained Morrow's direct supervisor, but Morrow understood that Skelly had the authority to ask him to perform work. (*Id*. at ¶¶ 9-10).

Morrow's Performance Issues

On August 3, 2013, Morrow received a disciplinary write-up from Krueger for using obscenities and yelling at Krueger in the presence of other employees. (*Id*. at ¶ 14). Krueger counseled Morrow to better control his anger and address complaints professionally.[2] (*Id*.) In October 2014[3], Kelly confronted Morrow for wearing a dirty t-shirt while working behind the desk in the pro shop. (*Id*. at ¶ 15). Morrow explained

---

[2] Morrow claims that the signed version of this write-up was removed from his personnel file and destroyed, but admits he received the write-up and does not dispute its contents.

[3] The parties dispute whether this incident took place on October 23, 2014 or October 27, 2014. (Dkt. 57 at ¶15). Regardless of the date of the incident, the parties do not dispute that the incident took place. (*Id*.)

2

that he was not in uniform because he did not have time to do his laundry and was supposed to be working in back that day, rather than in front of customers. (*Id.*) (Dkt. 56 Morrow Dep. at 29-30). In addition to these incidents, Morrow admitted that during his employment he had negative interactions with Park District Board Member Don Anderson and Park District patron Kevin Fitzgerald.[4] (Dkt. 57 at ¶ 16).

Kelly testified that in or around October 2014, two Park District Board Members approached her with complaints about Morrow's unprofessional behavior on the golf course and told her that Morrow should no longer work at the golf course. (*Id.* at ¶¶ 17-18).[5] Kelly interpreted the Board Members' comments as a directive and instructed Kreuger to terminate Morrow. (*Id.*) Krueger failed to do so. (*Id.*) Krueger testified that he believed he was instructed only to cut Morrow's hours, rather than terminate him. (Dkt. 67 at ¶ 71).

On October 25, 2014, Skelly asked Morrow to move a cooler from the kitchen. (Dkt. 57 at ¶ 20). Morrow responded by repeatedly kicking the cooler across the clubhouse and into the pro shop in full view of other employees and patrons. (*Id.*) Morrow testified that he may have also been complaining about Skelly while doing so. (*Id.*)

---

[4] Plaintiff claims that Fitzgerald antagonized him. But the content of Morrow's interactions with Fitzgerald are immaterial to his retaliation claim. It is undisputed that Morrow had negative interactions with Fitzgerald, a customer at the golf course.

[5] Morrow objects to the Board Members' complaints as hearsay. The Court finds the statements are being offered to show their effect on the listener (Kelly) and the motive behind the Park District's ultimate decision to terminate Morrow, rather than for their truth.

3

Morrow's Grievances

Later the night of October 25th Morrow testified he spoke with Krueger and handed him a written grievance complaining about Skelly's treatment of him. (*Id.* at ¶ 36). Regarding the cooler-kicking incident, Morrow claimed that he initially refused to move the cooler because he was off-shift. (Dkt. 56 Morrow Dep. at Ex. 2). According to Morrow, Skelly responded by cursing at him and demanding him to move the cooler, after which he "kicked the cooler into the hall because no one lifted a finger to help" him. (*Id.*) Morrow's grievance stated that (1) Skelly did not like him working behind the pro shop desk and complained about this to other employees; (2) Skelly forced him to do free work; and (3) he felt threatened that if Skelly does not get her way, she will report him to upper management. (*Id.*) Morrow further stated, "I feel this is happening because it is a female to male issue." (*Id.*) During deposition questioning Morrow admitted that "he has no basis for believing that any female employees were treated more favorably than he." (Dkt. 57 at ¶ 45). Krueger has no recollection of receiving a written grievance from Morrow or discussing it with Morrow. (*Id.* at ¶ 37). Krueger also does not recall discussing the grievance with anyone at the Park District. (*Id.*)

On Monday, October 27, 2014, Skelly emailed Krueger and Kelly informing them that "Morrow was yelling at me while kicking the coolers throughout the dining room" in the presence of customers. (*Id.* at ¶ 21). In response, Kelly emailed Krueger saying:

> First of all, I want to know why Rick [Morrow] is working so many hours when we have 2 full time positions for the proshop and I gave you explicit direction

4

to eliminate his hours?? I have been telling you for months that I receive complaints about him on a regular basis and he should not be working for us. With you and Tommy on full time why do we even need to hire him part time? Particularly at this time of year?

(*Id*. at ¶ 22). Krueger told Kelly that he "was informed of the incident on Saturday[,]" (*i.e.* October 25). (Dkt. 67 at ¶ 73). On Wednesday, October 29, 2017, Kelly terminated Krueger's employment in part because of his failure to fire Morrow. (Dkt. 57 at ¶ 24). Tim Scott took over Krueger's responsibilities, including directly supervising Morrow. (*Id.*)

On October 29, 2014, after Krueger's termination, Morrow discussed his grievance against Skelly with Scott. (*Id*. at ¶ 25). Scott prepared a memorandum on the same day addressed to Kelly regarding his conversation with Morrow. (*Id*. at ¶ 26). Scott testified that never saw Morrow's written grievance, but Scott's memo states that "[o]n Saturday, October 25, 2014, golf shop employee Rick Morrow filed a grievance against … Debbie Skelly." (*Id*. at ¶ 27); (Dkt. 56 Scott Dep at 16). Morrow admits that Scott's memo accurately described their conversation. (Dkt. 57 at ¶ 27).[6] Scott's memo states that Morrow complained that: (1) he was not on shift on October 25, 2014 (when he was asked to move the cooler); (2) Skelly comments that Morrow isn't working "while behind pro shop desk[;]" (3) Skelly threatens Morrow "that she could go to the Director and could cause him to lose his job[;]"; (4) Skelly "used foul language towards Rick Morrow in the presence of others"; and (5) Morrow "has

---

[6] During deposition testimony, Morrow asserted the last two paragraphs of the memorandum were inaccurate, but those paragraphs also do not concern gender discrimination. (Dkt. 56 Morrow Dep. at 42).

5

volunteered many hours without pay in the last month to help" Skelly. (*Id.*) The memo does not indicate, however, that Skelly's treatment of him was based on gender. (*Id.*)

Kelly learned of Morrow's grievance for the first time when she received Scott's memo, on or shortly after October 29, 2014. (*Id.* at ¶ 28). Kelly does not recall receiving or seeing Morrow's written grievance. (Dkt. 56 Kelly Dep. at 37-38). Kelly spoke to Skelly regarding Morrow's grievance. (Dkt. 57 at ¶ 29). Kelly also received an email from a witness to the events of October 25, 2014, stating that after Morrow "was asked to retrieve a cooler from the kitchen[,]" Morrow "became very upset and began kicking the cooler from the kitchen all the way through the dining room to the pro shop." (Dkt. 56 Kelly Dep. at Exhibit 4) (*Id.* at ¶ 30). The witness confirmed that Skelly "conducted herself in a professional manner, while [Morrow] [did] not." (*Id.*) Based on these communications, Kelly was "convinced that Rick Morrow's accusations were false." (Dkt. 56 Kelly Dep. at Exhibit 4). On November 12, 2014, Scott informed Morrow that Kelly had investigated his grievance and that the matter was closed. (Dkt. 57 at ¶ 31).

Toward the end of 2014, Kelly prepared notes regarding Morrow's performance. (Dkt. 56 Kelly Decl. at ¶ 10). In relevant part, Kelly documented the following occurrences: (1) on October 7, 2014, she instructed "Krueger to cut Morrow's hours" due to "several complaints from patrons and board members on his customer service skills[;]" (2) on October 21, 2014, "[a]fter receiving another complaint from a board member, [she] instructed Bill Krueger to terminate Rick Morrow[;]" (3) on October 23, 2014, she "saw Rick Morrow working behind the pro shop desk, with a

6

torn, dirty t-shirt on" and when she confronted him, he "became very agitated and said that Bill Krueger has him working so many hours that he did not have time to do a wash[;]" and (4) on October 25, 2014, Morrow filed a grievance against Skelly and Scott met with him to discuss it. (*Id.* at Ex. 1). Kelly concluded: "Rick is a seasonal employee. As protocol, we drastically cut staff during the winter season.… Based upon the complaints that I continue to receive on Rick, we would probably not be hiring him back in the spring anyway." (*Id.*)

Morrow's Termination

Morrow's last shift of the season was on November 10, 2014. (Dkt. 57 at ¶ 41). Morrow was laid off at the end of the season and not asked to perform off-season work for the Park District during the winter. (*Id.*) On April 15, 2015, Kelly notified Morrow that the Park District would not rehire him for the 2015 season "based on [his] very poor performance last season." (Dkt. 56 Morrow Dep. at Ex. 10). Specifically, Kelly explained:

> You will not be rehired for the 2015 season because: (1) you violated Park District Policy and received a disciplinary write-up on August 3, 2013 for using obscenities and yelling at your supervisor in the presence of other employees; (2) you violated Park District policies by failing to submit your tip sheets on several occasions; (3) Park District customers, employees and Board Members have complained about your work performance, work ethic, negative attitude and customer service on more than one occasion; and (4) in early November [sic] 2014, you kicked a cooler from the kitchen all the way through the dining room and into the Pro Shop, yelling and complaining about Debbie Skelly.

(*Id.*)

## **LEGAL STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

7

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986).

After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). Construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

## ANALYSIS

### I. Sex Discrimination

Morrow moves the Court to voluntarily dismiss his sex discrimination claim without prejudice (presumably under Fed. R. Civ. P. 41(a)(2)), and in the alternative, "does not dispute summary judgment in favor of Defendant with respect to" that

8

claim. (Dkt. 58 at 2). Under Fed. R. Civ. P. 41(a)(1), a plaintiff cannot voluntarily dismiss an action without a court order after the opposing party serves either an answer or a motion for summary judgment. Even where dismissal is inappropriate under Rule 41(a)(1), a plaintiff may move the Court to dismiss a claim without prejudice at any time "on terms that the court considers proper." *Id.* at 41(a)(2). A claim may not be dismissed under Rule 41(a)(2), however, if it would result in "plain legal prejudice" to the Defendant. *Kunz v. DeFelice*, 538 F.3d 667, 677 (7th Cir. 2008) (internal quotations omitted). Four factors are relevant to considering "whether this kind of prejudice would arise: the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant." *Id.* (internal quotations omitted).

Morrow brings his motion to dismiss after the close of discovery and after Defendant has argued that it is entitled to judgment on Morrow's sex discrimination claim. Although there is no evidence of delay or lack of diligence on Morrow's part, Morrow fails to provide any reason why dismissal is warranted. Morrow "admit[s] that he has no basis for believing that any female employees were treated more favorably than he." (Dkt. 57 at ¶ 45). Because dismissal at this point would be prejudicial to Defendant and because Morrow provides no reason why dismissal is warranted, Morrow's motion to dismiss is denied and summary judgment is granted, without objection, in Defendant's favor on Morrow's sex discrimination claim.

## II. Retaliation

Morrow claims that the Park District retaliated against him for filing a grievance alleging sex discrimination by laying him off at the end of the 2014 golf season and refusing to hire him back in 2015. For Morrow's retaliation claim to survive summary judgment, the evidence must permit a reasonable jury to find: (1) Morrow engaged in protected activity; (2) he suffered adverse employment action; and (3) a causal connection between the two. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). The parties do not dispute that Morrow's seasonal layoff and termination constitute adverse employment actions. The Park District argues that the evidence fails to establish Morrow's grievance is protected activity or that a causal connection exists between the grievance and Morrow's termination.

A. Protected Activity

Title VII "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice" under the Act. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). While "[t]he plaintiff need not show that the practice he opposed was in fact a violation of the statute[,] … his opposition must be based on a good-faith and reasonable belief that he is opposing unlawful conduct." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (internal citations omitted). "If he does not honestly believe he is opposing a practice prohibited by the statute, or if his belief is objectively unreasonable, then his opposition is not protected by the statute." *Id.* (internal citations omitted).

Morrow's written grievance against Skelly stated: "I feel this is happening because it is a female to male issue." (Dkt. 56 Ex. B at Ex. 2). Yet, when asked at his deposition what he meant by this, Morrow stated that he "was being ganged up on" by Skelly and Kelly, who are female, (Dkt. 57 at ¶ 49), indicating Morrow believed he was being mistreated by someone who was female, rather than being discriminated against because of his sex. Consistent with this finding, and as discussed below, there is no indication that Morrow brought up gender discrimination when he raised his grievance orally to Scott. (*Id.* at ¶ 27).

Furthermore, even if Morrow sincerely believed he was subject to sex discrimination, by his own admissions, he lacked an objective basis for that subjective belief. Morrow admits that he "has no basis for believing that any female employees were treated more favorably than he." (*Id.* at ¶ 45). He also testified that Skelly "was always more interested in [him]…than she was with other male employees," refuting an objective basis for believing that Skelly's animus towards him was based on his sex. (*Id.* at ¶ 47). In his written grievance, Morrow complains of Skelly (1) making him move a cooler when he was off-shift and cursing at him when he initially refused; (2) complaining to other employees about him working behind the pro shop desk; (3) forcing him to work off the clock; and (4) threatening to report him to upper management if she does not get her way. (Dkt. 56 Morrow Dep. at Ex. 2). With no basis to assert that Skelly treated female employees more favorably, the conduct Morrow complained of in his grievance could not reasonably be understood to constitute sex discrimination. *See Lord*, 839 F.3d at 563 ("Without evidence of a

11

prohibited motive, [plaintiff]'s belief that he was complaining about sexual harassment, though perhaps sincere, was objectively unreasonable."). Morrow's complaints against Skelly are "[m]ere[ ] complain[ts] in general terms of discrimination or harassment" which do not constitute statutorily protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Thus, no rational jury could find that Morrow engaged in statutorily protected activity when he complained.

B. Causal Connection

Even assuming Morrow's written or oral grievances constitute statutorily protected activity, Morrow fails to show that his grievances caused his layoff and termination. A plaintiff alleging retaliation under Title VII must show that the protected activity was the *but-for* cause of the challenged employment action. *Lord*, 839 F.3d at 563 (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). As a threshold matter, a plaintiff must establish "that the decision-maker knew that the plaintiff engaged in statutorily protected activity, because if an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them." *Tomanovich*, 457 F.3d at 668-89 (internal quotations omitted). To show causation, a plaintiff may rely on circumstantial evidence "includ[ing] suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski*, 937 F.3d at 924 (internal quotations omitted).

The evidence here fails to support a reasonable inference that Scott and Kelly, the decision-makers regarding Morrow's termination[7], knew that Morrow complained about sex discrimination in his written grievance. Scott and Kelly testified they had never seen Morrow's written grievance prior to his layoff and termination and had no reason to believe that Morrow complained about sex discrimination to anyone else. (Dkt. 57 at ¶¶ 35; 39). Morrow asks the Court to assume that because he discussed his written grievance with Scott and because the written grievance contained a statement regarding gender, Scott must have been aware that Morrow was complaining about sex discrimination. But Scott's memorandum, which Morrow agrees accurately summarizes their conversation, does not mention sex discrimination. (*Id.* at ¶ 27). Morrow did not testify, and does not present any evidence indicating, that he discussed sex discrimination with Scott at this meeting. Morrow also does not claim to have handed his written grievance to Scott at this meeting or at any other time. Morrow makes much of the fact that Scott must have known of the existence of his written grievance because Scott notes in his memo that "[o]n Saturday, October 25, 2014, golf shop employee Rick Morrow filed a grievance against … Debbie Skelly." (*Id.*) But Scott's knowledge of the existence of Morrow's written grievance cannot be equated to his knowledge of the alleged sex discrimination claim within that grievance, particularly in light of Scott's unrebutted testimony that he never saw the written grievance. Similarly, because Kelly only

---

[7] The parties dispute whether Kelly alone or Kelly and Scott were the decision-makers regarding Morrow's lay off and termination. Accepting all facts in the light most favorable to the Plaintiff, the Court assumes that both Scott and Kelly participated in the decision to layoff and terminate Morrow.

13

learned of Morrow's grievance through Scott's memo and because that memo contains no mention of sex discrimination, no reasonable jury could conclude that Kelly knew of Morrow's purported sex discrimination complaint. While Scott and Kelly were aware of Morrow's oral grievance to Scott, the evidence does not support the conclusion that they were aware of any grievance based on gender discrimination.

Morrow asks the Court to assume that because (1) he handed a written grievance to Krueger (who testified that he did not recall receiving a grievance or discussing it with anyone at the Park District), (2) a written grievance exists in the record, and (3) Kelly and Scott knew of a grievance and took actions in response to a grievance, a genuine issue of material fact exists about whether Scott and Kelly knew about his written grievance and the sex discrimination allegation therein. But without any evidence to contradict the testimony of Scott and Kelly that they did not see the written grievance and were not aware of the purported sex discrimination claim contained therein, the Court cannot make that inference. While the Court is required to make all reasonable inferences in Morrow's favor, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) (internal quotations omitted).

Moreover, even if Scott and Kelly were aware of Morrow's sex discrimination allegation, the Park District has demonstrated that Morrow would have been fired even absent that grievance due to a myriad of performance issues. Morrow admitted to (1) receiving a disciplinary write-up from Krueger in August 2013 for using

14

obscenities toward Krueger in front of other employees; (2) having negative interactions with at least one board member and one patron; (3) wearing a dirty t-shirt while working behind the pro shop desk; and (4) kicking a cooler across the clubhouse in front of other employees and customers.[8] (Dkt. 57 at ¶¶ 14-16; 20). Kelly testified that two Board Members approached her with specific instructions to fire Morrow due to his unprofessional behavior. (*Id.* at ¶ 17-18). These incidents were among the performance issues cited by Kelly in her notes towards the end of 2014 when she concluded that they "would probably not be hiring [Morrow] back in the spring" and in the 2015 letter denying Morrow's request to work the new season. (*Id.* at ¶ 34) (Dkt. 56 Morrow Dep. at Exhibit 10).

Morrow argues that because no adverse action occurred until after he raised his grievance, the Park District's explanation for his termination is pretextual: "[T]hese matters were evidently not serious enough to cause Defendant to act—or to ensure accountability in its supervision of Krueger—until Plaintiff engaged in protected activity. It is apparent that there is a genuine question of whether Plaintiff would have actually been laid off or ultimately terminated, but for the grievance." (Dkt. 58 at 12). A similar argument, however, was recently rejected by the Seventh Circuit in affirming summary judgment for the employer in *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019):

> Graham asserts that the behavioral problems cited by the notice—his apparent bad attitude, inability to complete work on time, and insubordination—could not be legitimate bases for his termination because he had received no written

---

[8] As noted earlier, Morrow attempts to raise an issue of material fact with respect to each of these incidents, but the only facts that are truly material, and which Morrow does not dispute, are that the conduct actually occurred and that Scott and Kelly were aware of it prior to learning of his grievance.

15

> notice or discipline for them before the Zamboni accident. His premise seems to be that by not addressing the issues earlier, Arctic Zone somehow forfeited its right to count these problems as black marks on his record. Not so. Arctic Zone's decision to let something slide without a formal response does not mean that it went unnoticed or untallied. And even minor grievances can accumulate into a record that justifies termination. A reasonable jury could not conclude that Arctic Zone was lying about the impact of these violations solely because Arctic Zone held its tongue when they occurred.

As in *Graham*, Morrow's performance issues "accumulate[d] into a record that justifie[d] termination[,]" such that "[a] reasonable jury could not conclude" that the Park District's decision to layoff and terminate Morrow for these performance issues was a pretext for retaliation. Moreover, Morrow's misconduct did not go "unnoticed or untallied," and unlike in *Graham*, the Park District did not "h[o]ld its tongue" regarding Morrow's performance issues. Prior to learning of his grievance on October 29, 2014, Kelly instructed Krueger to terminate Morrow in response to complaints from Board Members. (Dkt. 57 at ¶¶ 17-18). While Krueger believed he was instructed only to cut Morrow's hours, rather than fire him, Kelly intended to terminate Morrow earlier based on his performance issues. (Dkt. 67 at ¶ 71). This is underscored by the fact that on October 27, when Kelly learned of the cooler-kicking incident, her initial response was to question Krueger why Morrow was still working at the Park District. (Dkt. 57 at ¶ 22). Krueger was consequently terminated in part due to his failure to terminate Morrow. (*Id.* at ¶ 24). Thus, because Kelly expressed serious dissatisfaction with Morrow's conduct and an intent to terminate his employment prior to his grievance, it is not so suspicious that Morrow was terminated after his grievance. *Kilgas v. Kimberly-Clark Corp.*, No. 06-C-0991, 2007 WL 3025825, at *8 (E.D. Wis. Oct. 15, 2007) (granting summary judgment to employer

16

where "the record clearly shows that [supervisor] expressed concern about [plaintiff]'s performance before [plaintiff] complained about [a coworker's] more favorable treatment" because "[u]nder these circumstances, the timing of her termination in relation to the allegedly protected conduct is not so suspicious as to give rise to an inference of retaliation."). In addition to the fact that Morrow cannot establish that his grievance asserts gender discrimination, no rational jury could find that it was the but-for cause of his termination. Rather the undisputed evidence demonstrates that he was terminated because of his performance issues.

Finally, Morrow argues other seasonal employees who did not file grievances remained scheduled through the winter of 2014 or were rehired in 2015. While he agrees that these employees "did not have performance or conduct issues," he claims it is disputed "whether Plaintiff himself actually had performance or conduct issues which Defendant found sufficiently terminable[.]" (Dkt. 58 at 14). First, the Court rejects the notion that the Park District did not think his conduct was sufficiently serious to warrant termination. Prior to Morrow's grievance, Kelly instructed Krueger to fire Morrow and fired Krueger for not doing so. More importantly, to establish causation by pointing to similarly situated employees, those employees must be similar in all material respects, including engaging in identical or comparable misconduct. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009). As Morrow himself admits, the employees who remained on staff did not have performance issues, and hence, cannot serve as a yardstick for potential

17

retaliation. On the evidence before the Court, no reasonable juror could conclude that Morrow's grievance was the but-for cause of his termination.[9]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted. Plaintiff's motion to dismiss is denied.

E N T E R:

Dated: October 8, 2020

MARY M. ROWLAND
United States District Judge

---

[9] The parties present facts demonstrating that in 2016, the Park District banned Morrow from its premises, posting his picture with instructions to call the police if Morrow was seen on site. (Dkt. 57 at ¶¶ 59-62) (Dkt. 67 at ¶¶ 77-78). Morrow argues that these actions by the Park District show retaliatory animus and constitute further retaliation against him for his grievance. The evidence does not show any nexus between Morrow's grievance in 2014 and the Park District's decision to post his photo and ban him from the premises in 2016. The Court does not consider these facts in this employment case.